The Honorable Bill Walters State Senator P. O. Box 280 Greenwood, Arkansas 72936
Dear Senator Walters:
This is in response to your request for an opinion on several questions involving Act 34 of 1983. The questions have been restated, and answered, in the order in which they were posed.
 1. Does Section 8(b) of Act 34 of 1983 require a vote and a written agreement wherein it states that the school board and a majority of teachers may agree for a different distribution of salary funds?
Section 8(b) of Act 34 states in pertinent part as follows:
 In the 1983-84 and 1984-85 school years, each school district in the State shall pay to the certified personnel positions existing as of October 1, 1983, no less than either seventy percent (70%) of the increased State funds distributed under the provisions of this Act or one-half (1/2) of the money needed to raise its average salary for certified personnel to the average salary of the adjoining states, whichever is less. Provided that no teacher or administrator employed in a position existing as of October 1, 1983, shall receive a salary increase in such years of less than eight percent (80%) of the amount computed by dividing the increase in the State aid mandated for salary expenditure by the number of positions existing as of October 1, 1983, except that such requirement shall be waived in any district where the board and a majority of the teachers agree upon a salary schedule providing for a different distribution of salary funds. (Emphasis added).
While it is apparent that the Act on its face requires neither as vote nor a written agreement, such measures would not appear to be unreasonable in an attempt to verify and record the terms of what the board and teachers have agreed upon. Assuming that the State Board of Education has not issued other rules and regulations in its administration of the Act which govern the matter, (see 12 of Act 34), it may be concluded that a vote is a reasonable means of determining whether a majority of the teachers agree. Reducing the agreement to writing would also appear to be reasonable, and perhaps prudent, under the circumstances.
 2. Does Section 8(d) of Act 34 of 1983 mean that the State Department of Education could waive Act 34 if a school district were in financial distress? It is my understanding that the Supreme Court ruled that a school district could reduce its certified salaries to prevent a district from going in the red.
Section 8(d) of Act 34 states:
 If the requirements of this Section shall cause any district to have less than a full term of school, such district may apply to the State Board of Education for relief under regulations and criteria to be determined by the State Department of Education in the administration of this Act. It is the intent of this Act to insure that a reasonable and proper amount of a district's revenue be paid its certified personnel.
If the circumstances warranted such action, it may be concluded from the language of this section that the State Board of Education has authority to offer relief from the requirements of Section 8, "under regulations and criteria to be determined by the [Department]," which could conceivably involve a waiver of Section 8. This would only occur, according to the language of Section 8(d), if the requirements of that section shall cause any district ". . . to have less than a full term of school." The remainder of Section 8(d) must, however, also be considered wherein it is stated that "[i]t is the intent of this Act to insure that a reasonable and proper amount of a district's revenue be paid its certified personnel."
The Arkansas Supreme Court, in the case of Calico Rock School Dist. #50 v. Speak, 293 Ark. 206, 736 S.W.2d 10 (1987), made the following statement: ". . . an employment contract between teachers and school districts may be terminated in the event the district is unable to meet its financial obligations."293 Ark. at 207. Yet it must be recognized that this state was made in the context of and with reference to Ark. Code of 1987 Annotated6-13-620, previously codified as Ark. Stat. Ann. 80-509 (Repl. 1980), which provides in pertinent part under subsection (e) as follows:
 If in any school district it should be apparent that the school cannot be operated for the remainder of the school year without incurring more indebtedness than that represented by outstanding bonds, and those that may be issued for buildings, and equipment for the school buildings, purchasing sites, and repairing school buildings, or the improvement of sites, it shall be the duty of the school directors to close the school and cease paying the teachers for the remainder of that fiscal year, and each contract made with the teachers shall be subject to that contingency, and the district shall not be liable for teachers['] salaries for the time the school is so closed.
It therefore appears that that the Court's statement with respect to the termination of teacher contracts will only apply in those instances wherein the school must be closed because it cannot otherwise meet its bonded indebtedness. It seems clear that the ruling in Calico Rock is limited to that factual scenario, and will not apply where the requirements of Act 34 "cause any district to have less than a full term of school." See Section 8(d) of Act 34. The language of Section 8(d) will be controlling in that instance.
 3. If a teacher salary committee was in effect as of October 1, 1987, and they had a meeting with the Superintendent and Board to discuss and have explained to them a new index system which would be approved later by the Board of Education, does this not have anything to do with Item B of Section 8?
It must be concluded that the answer to this question is no. The provision in Section 8(b) for a waiver of the stated requirement upon agreement of the board and a majority of the teachers applies to the 1983-84 and 1984-85 school years. Similar language does, however, appear with respect to later years under Section 11(d) of Act 34.
 4. What constitutes a legal contract between a school board and a certified teacher? My question for a legal interpretation is, "If a contract is binding for a teacher that is over-paid, why then would a contract not be binding for an underpayment"? It is my understanding that a signed contract is a valid and binding document and remains so unless both parties have a mutual agreement for a change.
Ark. Code Sec. 6-13-620 contains various provisions relating to teacher contracts. It is clear under subsection (3) of 6-13-620
that the contracts must be in writing. See also Johnson v. West,225 Ark. 91, 279 S.W.2d 274 (1955). Subsection (3) also states that the contracts shall be in a form prescribed by the State Board of Education. These requirements, as well as the general body of law governing contracts, must be considered in determining whether a valid contract has been entered.
Your understanding with respect to changing a signed contract is, as a general matter, correct. However, your question regarding whether a contract is binding can only be answered in relation to a particular contract or contracts, and in the context of specific facts. The particular circumstances surrounding each contract must always be considered in assessing the appropriateness of a departure from the terms as written, or in determining the parameters of the actual agreement. It is well established, for example, that laws in force and effect when a contract is made are to be regarded as entering into and forming a part of the contract. Waldron v. Holland, 206 Ark. 401, 175 S.W.2d 570 (1943).
 5. If the school did not meet the requirement of Act 34 of 1983, should the bonding company not be liable for the amount of underpayment if there is an underpayment?
This question should, appropriately, be addressed by counsel to whom the district ordinarily looks for advice, since the answer will turn on the terms of the particular coverage involved.
 6. The Lavaca Public Schools received in May 22, 1985, some $55,276.00 for a misfigure of the school district's reappraisal. This was to be paid to the teacher salaries of 1983-84. Question: 1. Is this to be figured as a bonus for 1983-84 teachers as of October 1, 1983 or what? 2. Is the amount to be added to teachers contract, if so the amount would be for 1983-84, 84-85, 85-86, 86-87, 87-88. 3. What is the legal interpretation of the money received in May 22, 1985?
It must be initially noted that we cannot determine from the facts presented the year in which the reappraisal was completed. Section 6 of Act 34, as amended, would nevertheless appear to be controlling. This section, as amended, has been codified as Ark. Code Sec. 6-20-310 which provides as follows:
 (a) Funds shall be set aside from the total funds available for allocation under the provisions of this subchapter for adjustments in aid allocation to any district whose actual real property assessment, when certified by the county clerk or the county school supervisor, has increased or decreased by more than five percent (5%) from the projected amount used in determining the aid for the district.
 (b) The Department of Education shall make adjustments to the five percent (5%) level in the following manner:
 (1) For school districts that complete the reappraisal and rollback the millage in 1984 which is the 4th group of counties, adjustments shall be made in the 1984-85 school year for errors in the real property projections that were used to compute the Minimum Foundation Program Aid in 1983-84 and 1984-85.
 (2) For school districts that complete the reappraisal and rollback the millage in 1985, which is the 5th group of counties, adjustments shall be made in the 1985-86 school year for errors in the real property projections that were used to compute the Minimum Foundation Program Aid in 1983-84, and 1985-86.
 (c) In instances where school district experience significant losses in Minimum Foundation program Aid because of errors in the real property assessment projections, the Department of Education may make reasonable rules and regulations not inconsistent with this subchapter that would permit a recovery of the funds over a two-year period.
It is therefore clear under 6-20-310 that adjustments are to be made in the 1984-85 or 1985-86 school year, depending upon the year in which reappraisal and rollback were completed. In response to the third subquestion under your sixth question, it appears that the money received in 1985 constitutes the adjustment in aid allocation that was made as a result of an error or errors in real property projections used to compute Minimum Foundation Program Aid.
In response to the other two questions posed under Question 6, Act 34 offers no clear guidance in this regard. However, if it is clear that these funds would have been applied to teacher salaries in 1983-84 but for the error in real property assessment, then it may be reasonably concluded that payment should be considered as salary for that year.
7. What is the legal interpretation of the following should the school have to pay the possible underpayment to some of the teachers?
a. What years will this be accredited to, 1983-84 or 1987-88?
b. Will the teachers not have to amend their 1983-84 IRS taxes?
c. What about those teachers who have retired? This could affect their retirement?
As noted in response to the last question, it is my opinion that the teacher salary payments may reasonably be attributed to the year in which payment would have been made but for the error in reappraisal.
The teachers will not amend their 1983-84 taxes, but rather will treat the payments as income in the year of receipt.
In response to your question regarding retirement, if the payments constitute salary which, but for the error in assessment would have been paid in the 1983-84 school year, then it is my opinion that the payments should be applied to the 1983-84 year for retirement purposes.
8. Does the School Board of Lavaca Public School District #3 have any legal steps they could take against the superintendent under contract for 1983-84 to recover any of these funds should it be proved there is an underpayment to some of the teachers?
It is difficult to conceive of a basis for the superintendent's liability since as a general matter, the superintendent is not involved in the reappraisal and roll back process. This question will, however, ultimately depend upon the particular facts involved.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General Elisabeth A. Walker.
Sincerely,
STEVE CLARK Attorney General
SC:jlh
cc — Mr. Carl E. Steward Superintendent Lavaca Public Schools Lavaca, Arkansas 72941 (Airborne Express)